564 F.2d 112
 2 Fed. R. Evid. Serv. 395
 Helen GAGLIARDI
v.
Robert FLINT, Joseph F. O'Neill, Frederick Ruffin, Francis
O'Shea and the City of Philadelphia.
Appeal of Robert FLINT and City of Philadelphia.
 No. 76-1964.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 25, 1977.
Decided Aug. 10, 1977.
As Amended Dec. 6, 1977.
 
 Benjamin Kuby, Jerold Allen, Klovsky, Kuby and Harris, Public Interest Law Center of Philadelphia, Philadelphia, Pa., for appellee.
 Ralph Teti, Asst. City Sol., Louis F. Hinman, III, James M. Penny, Jr., Asst. City Sols., James D. Moran, Deputy City Sol., Sheldon L. Albert, City Sol., Philadelphia, Pa., for appellants.
 OPINION OF THE COURT
 Before GIBBONS, FORMAN, and ROSENN, Circuit Judges.
 ROSENN, Circuit Judge.
 
 
 1
 The City of Philadelphia and Robert Flint, a city police officer, appeal from the denial of their motion for a new trial. The judgment against them was the outcome of a wrongful death action resulting from the shooting death of Joseph Gagliardi, a 24 year old civilian, by Flint. It appears to be undisputed that in response to a police radio report concerning a man sleeping on a porch in the 4600 block of North 11th Street, Philadelphia, Officer Flint drove to that block and there observed Gagliardi running from the steps of a house. After using his car to pin Gagliardi against a wall but finding no weapon or burglary tools on his person, Flint attempted to take Gagliardi into custody. During the tussle which ensued, Flint failed to use his baton as required by police regulations but instead utilized first his blackjack and then his gun. Two shots were fired, the second of which proved fatal. Police reports showed that Flint fatally shot Gagliardi in the back as Gagliardi was running away from him. Gagliardi's mother thereafter initiated this action in the United States District Court for the Eastern District of Pennsylvania.
 
 
 2
 Both appellants rely on alleged trial errors. The City also claims that the district court erred in entertaining the pendent Pennsylvania law claim upon which its respondeat superior liability is predicated. It does not claim that the court misapplied Pennsylvania law. We affirm.
 
 I. THE CITY'S JURISDICTIONAL CHALLENGE
 
 3
 The City, relying on Aldinger v. Howard, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 296 (1976), and Tully v. Mott Supermarkets, 540 F.2d 187 (3d Cir. 1976), contends that the district court erred in entertaining a pendent state law cause of action against it because there was no independent basis of federal jurisdiction over it. In addition to the state law wrongful death claims the complaint alleges causes of action under 42 U.S.C. § 1983 and directly under the fourteenth amendment. Though the complaint alleges violations based directly under the fourteenth amendment, and seeks damages far in excess of $10,000,[1] the jurisdictional allegations did not specifically refer to the general federal question jurisdiction statute. 28 U.S.C. § 1331. Rather, jurisdiction over the federal claims was premised on 28 U.S.C. § 1343. Relying, however, on 28 U.S.C. § 1653 the appellee moved before this court, at the argument of the appeal, to amend the jurisdictional statement by including a reference to section 1331. See Rotolo v. Borough of Charleroi, 532 F.2d 920, 922 (3d Cir. 1976). We reserved decision on the motion in order to afford to the City the opportunity to file a brief setting forth any manner in which it would be prejudiced with respect to the issues tried in the district court if that motion were granted. The City's response indicated no such prejudice, but opposed the motion on the ground that in any event section 1331 affords no independent basis of jurisdiction over it for a claim based upon a fourteenth amendment violation. Since the City has not called attention to any way in which the trial would have differed had the complaint's jurisdictional statement referred to section 1331 we grant the motion to amend, and proceed to the merits of the City's contention that section 1331 provides no basis for jurisdiction over it.
 
 
 4
 The answer to the question of section 1331 jurisdiction depends on how substantial is the constitutional claim. In the case sub judice, the plaintiff's complaint against the City asserts both a federal claim based directly on the fourteenth amendment and pendent state law claims based on Pennsylvania's Wrongful Death Act. Hagans v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974), holds that a federal court may, and indeed usually should, decide pendent, nonconstitutional claims if by doing so the court can avoid the decision of difficult constitutional issues. This is true even if the pendent claims standing alone would be beyond the jurisdiction of the federal court. 415 U.S. at 546-47 & nn.12-13, 94 S.Ct. 1372. The only requirement for this exercise of pendent jurisdiction over state law claims is that the federal constitutional claims herein asserted not be so insubstantial as to be incapable of supporting federal jurisdiction. Under Hagans, we may reverse the district court's determination to decide the pendent state law claims against the city only if the fourteenth amendment claim is so insubstantial that it cannot serve as the basis for federal question jurisdiction under the general federal question statute, 28 U.S.C. § 1331 (1970). See Hagans, supra, 415 U.S. at 542-43, 94 S.Ct. 1372, citing Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946).[2]
 
 
 5
 To determine whether the fourteenth amendment claim is insubstantial,[3] we need go no further than the recent pronouncement of the Supreme Court in Mt. Healthy School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). The Court there made clear that none of its prior opinions should be construed as deciding whether there can be a fourteenth amendment implied remedy of damages:
 
 
 6
 The question of whether the (defendant's) arguments should prevail, or whether as respondent urged in oral argument, we should, by analogy to our decision in Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), imply a cause of action directly from the Fourteenth Amendment which would not be subject to the limitations contained in § 1983, is one which has never been decided by this Court.
 
 
 7
 Id. at 278, 97 S.Ct. at 571. See also Aldinger v. Howard, 427 U.S. 1, 4 n.3, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976) (leaving the question open); City of Kenosha v. Bruno, 412 U.S. 507, 514-15, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1976) (leaving the question open).
 
 
 8
 Since there is no Supreme Court decision holding that a fourteenth amendment damage remedy may not be implied and numerous lower court decisions holding that such a remedy may be, see the cases cited in note 3 of Judge Gibbons' concurring opinion, we cannot say that the fourteenth amendment claim against the City is "so insubstantial, implausible, foreclosed by prior decision of the (Supreme) Court, or otherwise completely devoid of merit as not to involve a federal controversy within the jurisdiction of the District Court," Hagans, supra, 415 U.S. at 543, 94 S.Ct. at 1382, quoting Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 666-67, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974). It may be that a respectable case can be stated in support of the proposition that a cause of action for damages on the basis of vicarious liability cannot be implied against a municipal corporation under the fourteenth amendment. Nonetheless, it is evident under Mt. Healthy, supra, that the question remains perplexing and substantial. Thus, we conclude that the fourteenth amendment claim against the City was sufficiently substantial to vest the district court with federal question jurisdiction under 28 U.S.C. § 1331.
 
 
 9
 Given the presence of federal jurisdiction, Hagans teaches that the district court did not abuse its discretion when it avoided the difficult constitutional question whether to imply a fourteenth amendment remedy in damages and proceeded instead to try the pendent state law claims. See also Mayor of Philadelphia v. Educational Equality League, 415 U.S. 605, 636-37, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974) (White, J., dissenting); Siler v. Louisville & Nashville R. Co., 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909); Doe v. Beal, 523 F.2d 611, 614 (3d Cir. 1975) (en banc), rev'd on other grounds, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977).
 
 II. TRIAL ERRORS
 
 10
 The claimed trial errors advanced in support of the appellants' new trial motion need not detain us long. They consist of one exclusion and three admissions of evidence.
 
 
 11
 The excluded evidence consisted of a welfare record of the decedent, offered, in the damage phase of a bifurcated trial, in an effort to denigrate the decedent's potential employability. As the record was cumulative of oral testimony that was admitted, and was excluded on that ground, there was no abuse of discretion.
 
 
 12
 The appellants also urge as error that in rebuttal testimony the appellee, decedent's mother, was allowed to testify as to a hearsay statement by a police officer to a statement by an eyewitness, "they didn't have to kill the kid." The hearsay statement was arguably inconsistent with a written statement of the same eyewitness, admitted in evidence in appellants' case. As there was no timely objection, we will not consider the allegedly hearsay testimony as error. See Fed.R.Evid. 103(a)(1).
 
 
 13
 The defendant also contends that in the damage phase of the trial the court erred in admitting the testimony of a witness, Mrs. McGeehan, about negotiations between her son, who had been beaten by Flint in an unrelated incident, and Flint's superior. The court ruled that the testimony was admissible to show the City's knowledge of the incident. Such knowledge of Flint's dangerous propensities was relevant to the issue of punitive damages. The hearsay objection is groundless. See Fed.R.Evid. 801(d)(2)(D). The relevancy of the testimony was a matter within the trial court's discretion. Fed.R.Evid. 402, 403.
 
 
 14
 Finally, appellants contend that the court erred in permitting Mrs. Gagliardi to testify that her son went to work as a painter. They contend that this testimony was hearsay. In those instances where a hearsay objection was made the court ruled correctly that the objection was groundless, since the witness was present at the incidents related. In the other instances there was no objection. If there were any errors in determining whether given questions sought hearsay evidence, the evidence was otherwise admissible under an exception since the declarant was unavailable. See Fed.R.Evid. 804. Moreover any such error was harmless.CONCLUSION
 
 
 15
 The order denying the appellants' motion for a new trial will be affirmed. Appellants also filed notice of appeal from the order of the district court denying their motion for judgment notwithstanding the verdict but abandoned the same in this court. This order of the district court will also be affirmed.
 
 
 16
 GIBBONS, Circuit Judge, concurring.
 
 
 17
 I join in Judge Rosenn's opinion, but not in the reservations set forth in footnote 3 thereof respecting the present law of this circuit. Moreover, since it seems likely that the City of Philadelphia will seek certiorari, it seems to me appropriate not only to reiterate what the law is with respect to implying causes of action directly from the Fourteenth Amendment against municipalities, but also why, both historically and precedentially, the City's challenge to such an action is unfounded. In writing separately I do not intend to suggest, however, that Judge Rosenn's analysis inadequately supports our affirmance of the district court judgment.
 
 
 18
 * In Skehan v. Board of Trustees of Bloomsburg State College, 501 F.2d 31, 44 (3d Cir. 1974), vacated and remanded on other grounds, 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975), on remand, 538 F.2d 53 (3d Cir. 1976) (en banc), we wrote:
 
 
 19
 Skehan asserts jurisdiction under 28 U.S.C. § 1331 and under 28 U.S.C. § 1343(3), (4) and the Civil Rights Acts. The jurisdictional amount requisite to support jurisdiction under § 1331 is pleaded, and the claim for recovery in excess of $10,000 clearly is not frivolous. Jurisdiction over the individual defendants is clear both under § 1331 and under § 1343 and 42 U.S.C. § 1983. Because the requisite jurisdictional amount for § 1331 is pleaded, the fact that the College is not a "person" within the meaning of 42 U.S.C. § 1983 is not significant. . . . There is § 1331 jurisdiction to award relief against the College if under Pennsylvania law it is not an agency of the Commonwealth covered by the Commonwealth's immunity.
 
 
 20
 Since then, in Rotolo v. Borough of Charleroi, 532 F.2d 920, 922 (3d Cir. 1976) (per curiam), and McCullough v. Redevelopment Authority of Wilkes-Barre, 522 F.2d 858, 864 (3d Cir. 1975), we expressly held that a Fourteenth Amendment cause of action could be asserted against municipal corporations which were not persons within the meaning of 42 U.S.C. § 1983.[1] In Alderman v. Philadelphia Housing Authority, 496 F.2d 164 (3d Cir. 1975), cert. denied, 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (1974), we entertained suits for Fourteenth Amendment violations against a municipal and an educational corporate body, respectively, neither of which was a person within the meaning of § 1983. And this law has been followed in the district courts of this circuit repeatedly. E. g., Marvasi v. Shorty, 70 F.R.D. 14, 18 (E.D.Pa.1976) (tort claim for police mistreatment); Redding v. Medica, 402 F.Supp. 1260, 1261 (W.D.Pa.1975) (tort claim for police mistreatment); Patterson v. City of Chester, 389 F.Supp. 1093, 1095-96 (E.D.Pa.1975) (dismissal of city employee); Maybanks v. Ingraham, 378 F.Supp. 913, 914-16 (E.D.Pa.1974) (dismissal of city employee); Pinto v. Clark, 407 F.Supp. 1209, 1210 (E.D.Pa.1976) (police mistreatment); Santore v. City of Philadelphia, Civil No. 76-904 (E.D.Pa.1976) (police mistreatment); Harris v. City of Philadelphia, Civil No. 75-3662 (E.D.Pa. filed Sept. 7, 1976); Rice v. City of Philadelphia, 66 F.R.D. 17 (E.D.Pa.1976) (police mistreatment); Sedule v. Capital School District, 425 F.Supp. 552 (D.Del.1976) (dismissal of school district employee). But see Crosley v. City of Philadelphia, 426 F.Supp. 389 (E.D.Pa.1977); Anderson v. Erwin, Civil No. 76-2020 (E.D. Pa.1976); Pitrone v. Mercadante, 420 F.Supp. 1384 (E.D.Pa.1976).[2]
 
 
 21
 In footnote 3 Judge Rosenn suggests that in the four third circuit cases referred to above no more was decided than that there was § 1331 jurisdiction, not that the complaints stated a claim upon which relief could be granted against a municipality. If any of these cases were before us after an order dismissing them for lack of jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), they could be so read. But every one of them was a review of a dismissal on the merits, and in every one we reversed or affirmed on the merits. In Alderman v. Philadelphia Housing Authority, supra, Judge Adams, reviewing a dismissal on the merits, wrote:
 
 
 22
 We reverse the judgment of the district court, and adjudge the appellants entitled to relief based on their prior restraint argument. The justification proffered by P.H.A. and Mr. Stein for the attempt, by way of their memorandum and the appellants' discharges, to throttle all discussion by P.H.A. employees of the R.A.B. referendum, is, stated broadly, that the P.H.A. has a legitimate and compelling interest in preserving intact the image of P.H.A.'s impartiality. Important as this interest may have been, we conclude that it did not outbalance the weighty values sheltered by the First Amendment.
 
 
 23
 Accordingly, the judgment of the district court will be reversed and the case remanded for treatment consistent with this opinion. . . .
 
 
 24
 496 F.2d at 167, 174.
 
 
 25
 Certainly Judge Adams was aware in writing Alderman that 42 U.S.C. § 1983, as construed in Monroe v. Pape, supra, afforded no cause of action against the Philadelphia Housing Authority for a violation of the First Amendment, applicable to it by virtue of the Fourteenth. This reversal on the merits cannot be construed otherwise than as a holding that a cause of action against a municipality for a First Amendment violation can be implied directly from the Fourteenth Amendment.
 
 
 26
 Nor can McCullough v. Redevelopment Authority of Wilkes-Barre, supra, be passed off as a mere Rule 12(b)(1) ruling. Judge Garth, the author of McCullough, was as aware, we may be sure, as was Judge Adams in Alderman, that the Redevelopment Authority was not a "person" within the meaning of § 1983. Yet his review of the merits of an equal protection challenge in an action against a municipality occupies seven pages of the Federal Reporter, and concludes:
 
 
 27
 Having reviewed all of the plaintiffs' numerous equal protection arguments, we agree with the district court that the burden of proving an equal protection violation was not met by the plaintiffs.
 
 
 28
 522 F.2d at 880. He also reviewed on the merits a due process contention. Id. By reviewing these contentions on the merits and rejecting them on the basis of failure to meet the burden of proof, the court implicitly held that had the burden of proof been met a cause of action implied from the Fourteenth Amendment could be asserted. This was no mere "jurisdictional" holding, for it certainly would prevent relitigation of the same claim against the Redevelopment Authority in the state court under principles of res judicata.
 
 
 29
 Rotolo v. Borough of Charleroi, supra, also was a review of a dismissal on the merits, in which the district court relied on Monroe v. Pape, supra. In reversing to permit an amendment of the complaint, we expressly noted that such an amendment could make the case justiciable under 28 U.S.C. § 1331. The Rotolo panel split over the applicability of special pleading rules in civil rights cases, but it was unanimously of the view that a cause of action against a municipality could be implied from the Fourteenth Amendment, since all three panel members recognized that § 1983 was inapplicable. Certainly the panel was not reversing for the futile exercise of inviting a second dismissal under Rule 12(b)(6) on a slightly different ground.
 
 
 30
 As to Skehan, I can only say, as the author of the court's in banc opinion, that there was never any doubt in my mind as to what was intended. We remanded in that case for a determination of the corporate status of Bloomsburg State College. If it were part of the state government, we said, the Eleventh Amendment was a bar to the suit. If it had a separate corporate existence, it could be sued. The suggestion that we were merely dealing with "jurisdiction" in the Rule 12(b)(1) sense is extreme. We were not reviewing a Rule 12(b)(1) dismissal, and our remand certainly was not for the purpose of inviting a Rule 12(b)(6) motion. We were not, I hope, playing games with the litigants.
 
 II
 
 31
 The City contends that this circuit's rule, that causes of action against municipalities may be implied from the jurisdictional grant in § 1331 and the Fourteenth Amendment, was overruled by the Supreme Court in Aldinger v. Howard, supra. However, as Justice Rehnquist states: "All that we hold (in Aldinger ) is that where the asserted basis of federal jurisdiction over a municipal corporation is not diversity of citizenship, but is a claim of jurisdiction pendent to a suit brought against a municipal officer within § 1343, the refusal of Congress to authorize suits against municipal corporations under the cognate provisions of § 1983 is sufficient to defeat the asserted claim of pendent-party jurisdiction." Aldinger, supra, 427 U.S. at 17 n.12, 96 S.Ct. at 2422. The key to that holding is that a federal court should not readily exercise pendent jurisdiction to entertain a non-federal claim against a party over whom no independent federal jurisdiction exists. That Aldinger v. Howard casts no doubt upon our conclusion in Skehan, that the fact that a municipality is not a "person" within the meaning of § 1983 is not significant for purposes of § 1331 jurisdiction, is amply confirmed by Justice Rehnquist's opinion in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). He writes:
 
 
 32
 (T)he District Court makes clear its view that if the jurisdictional basis for the action is § 1331, the limitations contained in 42 U.S.C. § 1983 do not apply. The Board argues, on the contrary, that since Congress in § 1983 has expressly created a remedy relating to violations of constitutional rights under color of state law, one who seeks to recover for such violations is bound by the limitations contained in § 1983 whatever jurisdictional section he invokes.
 
 
 33
 The question of whether the Board's arguments should prevail, or whether as respondent urged in oral argument, we should, by analogy to our decision in Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, (91 S.Ct. 1999, 29 L.Ed.2d 619) (1971), imply a cause of action directly from the Fourteenth Amendment which would not be subject to the limitations contained in § 1983, is one which has never been decided by this Court. Counsel for respondent at oral argument suggested that it is an extremely important question and one which should not be decided on this record. We agree with respondent.The Board has raised this question for the first time in a document filed after its reply brief in this Court. Were it in truth a contention that the District Court lacked jurisdiction, we would be obliged to consider it, even as we are obliged to inquire sua sponte whenever a doubt arises as to the existence of federal jurisdiction. Liberty Mutual Insurance Co. v. Wetzel, 424 U.S. 737, 740, (96 S.Ct. 1202, 1204, 47 L.Ed.2d 435) (1976); Louisville & Nashville Railroad Co. v. Mottley, 211 U.S. 149, 152, (29 S.Ct. 42, 43, 53 L.Ed. 126) (1908). And if this were a § 1983 action, brought under the special jurisdictional provision of 28 U.S.C. § 1343 which requires no amount in controversy, it would be appropriate for this Court to inquire, for jurisdictional purposes, whether a statutory action had in fact been alleged. City of Kenosha v. Bruno, supra. However where an action is brought under § 1331, the catch-all federal question provision requiring $10,000 in controversy, jurisdiction is sufficiently established by allegation of a claim under the Constitution or federal statutes, unless it "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction . . ." Bell v. Hood, 327 U.S. 678, 682, (66 S.Ct. 773, 776, 90 L.Ed. 939) (1946); Montana-Dakota Utilities v. Public Service Co., 341 U.S. 246, 249, (71 S.Ct. 692, 694, 95 L.Ed. 912) (1951).
 
 
 34
 Certainly the Fourteenth Amendment allegation in the case sub judice was not immaterial or made solely for the purpose of obtaining jurisdiction. Indeed, it is the foundation of the action against the individual defendant as well as the City.[3] And the Supreme Court's explicit statement that it has never addressed the interrelationship between §§ 1983 and 1331 upon the question of municipal liability in no way affects the law of this circuit. Nevertheless, we are asked to hold that despite the impressive list of authorities discussed above, the allegations of a cause of action based directly under the Fourteenth Amendment against a municipal corporation for damages in excess of $10,000 is too patently insubstantial to sustain the exercise of pendent jurisdiction over the related state law claims. This, we think, is asking more than can reasonably be expected. See Hagens v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); White v. Beal, 555 F.2d 1146 (3d Cir. 1977).
 
 III
 
 35
 One of the City's contentions is that there is no § 1331 jurisdiction over a claim against a municipal corporation for a federal common law tort. That contention is completely foreclosed by the Supreme Court's unanimous decision in Illinois v. City of Milwaukee, 406 U.S. 91, 98-108, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972), holding that there is § 1331 jurisdiction in the federal district courts to entertain a federal common law nuisance cause of action for pollution of interstate waters. If the Supreme Court can imply a federal common law cause of action for the abatement of nuisance merely from the fact of § 1331 jurisdiction and its role as interstate umpire in a federal system, then implying a tort cause of action from § 1331 jurisdiction and an express constitutional provision would seem to be an a fortiori case. See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 395-97, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). To hold for the City, overruling our prior case law, we would have to predict that the Supreme Court, having recognized a federal common law remedy for the tort of water pollution of an interstate waterway, would draw the line at recognizing a federal common law remedy for bodily injury or death at the hands of a state agent in violation of the Fourteenth Amendment. Such an outcome is conceivable, but would require that we attribute to the Justices a rather peculiar hierarchy of values, in which clean water is entitled to greater protection by federal law than is human life. The massive potential liabilities which may be imposed on municipal corporations by virtue of Illinois v. City of Milwaukee liabilities which may require enormous construction projects for water treatment facilities dwarf by comparison the liabilities which might be imposed by virtue of a City's respondeat superior liability for constitutional torts of its servants. The latter liabilities, moreover, can be feasibly insured against, while the former almost certainly cannot.
 
 
 36
 One might argue, of course, that from the nature of the federal union, in matters of interstate pollution the rule of substantive decision must be federal. That argument does not serve to answer the remedies question, however. Granting that from the nature of the federal union rules of decision in interstate pollution cases must be federal, the question of remedies for the enforcement of that rule of decision is no different than in the Fourteenth Amendment context. Both rules of decision are implied from the Constitution, and there is no distinction which occurs to me for implying a damage remedy in one context and not the other.
 
 IV
 
 37
 Although Illinois v. City of Milwaukee is a more recent instance of the recognition of a federal common law remedy against a municipal corporation, the development occurred much earlier in Fourteenth Amendment cases. In Home Telephone & Telegraph Company v. City of Los Angeles, 227 U.S. 278, 33 S.Ct. 312, 57 L.Ed. 510 (1912), for example, the Court entertained a suit against a municipal corporation for injunctive relief against an ordinance establishing a confiscatory tariff. The City would, however, distinguish between prospective equitable relief and the recovery of money damages. In making this distinction it can draw no comfort from the holdings in Monroe v. Pape and City of Kenosha v. Bruno. These cases held that municipal corporations were not "persons" within the meaning of § 1983 and that there is no § 1343(3) jurisdiction over them for any purpose.[4] They were in effect immunized from federal civil process for actions under § 1983. But as Illinois v. City of Milwaukee shows, municipal corporations clearly are suable when the jurisdictional elements of § 1331 are met. Thus, if there is a distinction between prospective equitable relief and money damages, it is a distinction without "jurisdictional" significance, using "jurisdiction" in the Monroe v. Pape sense of absolute immunity from suit. Rather, it is a distinction going solely to whether a § 1331 claim for money damages states a claim upon which relief may be granted.
 
 
 38
 There is, however, no question that as a matter of federal substantive law there is a cause of action against municipal corporations for money damages for Fourteenth Amendment violations. In deciding appeals from the state courts, the Supreme Court has recognized such a cause of action and has held that state courts must recognize it. E. g., Griggs v. Allegheny County, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962); Hopkins v. Clemson Agricultural College, 221 U.S. 636, 645-49, 31 S.Ct. 654, 55 L.Ed. 890 (1911); Chicago B. & O. R.R. v. City of Chicago, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897). These cases involved the recovery of money damages for unconstitutional taking of property. They establish that federal common law does encompass the remedy of recovery of money damages. It would be anomalous indeed to hold that federal common law can impose such a remedy on state courts of general jurisdiction, but lacks the capacity to do so in the lower federal courts. Lower federal courts have not recognized such an anomalous distinction. They have frequently entertained suits against municipal corporations for the recovery of money damages for uncompensated takings of property or takings of property without due process of law.[5] The City's proposed distinction between money damage remedies and prospective equitable relief could not be accepted unless we were ready to assume that all these courts were so clearly in error that their holdings should be regarded as frivolous or insubstantial.[6]
 
 V
 
 39
 Ultimately, of course, what the City wants us to do is to construe § 1983 as a Congressional prohibition against municipal corporation liability for Fourteenth Amendment violations. It urges that this is the "true meaning" of Part III of Monroe v. Pape, supra. That opinion holds that a municipality cannot be sued for damages under § 1983 because Congress intended that the word "person", which defines the class of defendants suable under § 1983, not include municipalities. This holding, however, is not based on any explicit legislative history pertaining to the meaning of the word "person" as used in § 1983. Instead, it is based on inferences drawn from Congressional debates surrounding the rejection by the House of Representatives of the Senate-passed Sherman amendment to the Civil Rights Act of 1871.[7]
 
 
 40
 The Sherman amendment would have imposed strict liability for damages on every municipality in which specified acts of violence took place without regard to whether the offenders had any connection with the municipality.[8] The rationale behind the Sherman amendment was that the imposition of strict liability upon municipalities would encourage Southern landowners to cease support of Ku Klux Klan activities[9] and to take affirmative action to prevent such acts of violence as condemned by the amendment.[10] The amendment was the subject of vigorous debate in both houses. Its opponents argued that Congress lacked the constitutional power to impose such liability on municipal bodies,[11] that the imposition of such liability might result in municipal bankruptcy,[12] and that few municipalities possessed the machinery, i. e., a police force, to prevent such acts as condemned by the amendment.[13] Though the Senate adopted the amendment, it was rejected by the House. On the basis of this rejection and the content of the Congressional debates the Supreme Court concluded:
 
 
 41
 The response of the Congress to the proposal to make municipalities liable for certain actions being brought within federal purview by the Act of April 20, 1871, was so antagonistic that we cannot believe that the word "person" was used in this particular Act to include them.
 
 
 42
 365 U.S. at 191, 81 S.Ct. at 486 (footnote omitted).[14]
 
 
 43
 Some time we may learn, perhaps from published memoirs of a Justice, what process of internal advocacy produced the peculiar example of statutory construction which transmogrified a negative vote on an amendment which would have imposed municipal liability without fault for the acts of persons unrelated to the municipality into an affirmative decision that municipal corporations were immune from suits under the statute altogether. But it is one thing to hold that the rejection of the Sherman amendment serves to enlighten the construction of the Civil Rights Act of 1871. It is quite another to suggest that its rejection, by one house, amounted to the adoption of an entirely new doctrine that municipal corporations are immune from suit altogether. Acceptance of such a suggestion would require that the rejected Sherman amendment carry far more intellectual baggage as a source for discernment of Congressional intention than contemporary evidence would allow.
 
 
 44
 Congress was perfectly well aware in 1871 that municipal corporations were regularly being sued for money damages in the federal courts under the only significant lower federal court jurisdiction then extant, the diversity jurisdiction. In a series of cases beginning at least as early as Commissioner of Knox County v. Aspinwall, 62 U.S. (21 How.) 539, 16 L.Ed. 208 (1859), and extending to Gelpcke v. Dubuque, 68 U.S. (1 Wall.) 175, 17 L.Ed. 520 (1864), the Court fashioned a "general" common law of negotiability of municipal bonds, enforced by the entry of money judgments against municipalities.[15] And in Board of Commissioners of Knox County v. Aspinwall, 65 U.S. (24 How.) 376, 16 L.Ed. 735 (1861), the Court held that in aid of the enforcement of its judgment a federal court could, pursuant to § 14 of the Judiciary Act of 1789,[16] issue a writ of mandamus against municipal officials to levy and collect taxes to pay that judgment.[17] The state courts of Iowa resisted this development vigorously,[18] and attempted to enjoin municipal officials from making any such levy. In Riggs v. Johnson County, 73 U.S. (6 Wall.) 166, 18 L.Ed. 768 (1868),[19] the Court rebuked this effort, holding that no state process could bar the effectiveness of federal court mandamus in aid of the execution of a federal court judgment. And a year later in Supervisors v. Rogers, 74 U.S. (7 Wall.) 175, 19 L.Ed. 162 (1869), the Court approved the appointment of a United States Marshal as a commissioner to levy taxes in order to satisfy a federal court judgment against a municipal corporation.
 
 
 45
 The dispute between Iowa municipalities and the federal courts was a national cause celebre and continued so throughout the period leading up to the grant of general federal jurisdiction in 1875.[20] It was so heated an issue that on June 20, 1870, President Grant let it be known that the executive branch would support the federal courts by use of force if necessary.[21] Congress was directly involved in the dispute, for on June 9, 1870, an Iowa congressman introduced H.R. 2150,[22] and on June 20, 1870, an Iowa Senator introduced S. 1002;[23] both aimed at overruling Gelpcke v. Dubuque and thereby relieving the municipalities of the Midwest of the necessity for paying the bonds they had so improvidently issued in the boom years of railroad expansion.[24] H.R. 2150 died in Committee, and S. 1002 was reported adversely and postponed.[25]
 
 
 46
 The rejection of these bills must be considered in light of the then in effect statutes relating to the law of remedies in the federal courts. They were the Process Acts of 1792,[26] 1793,[27] and 1828,[28] providing for an independent law of remedies on the equity side and for static conformity to the state law of remedies on the law side.[29] In the Conformity Act of 1872[30] Congress amended the Process Acts by providing for dynamic conformity to the state law of remedies on the law side.[31] When the Judiciary Act of 1875[32] conferred general federal question jurisdiction, it made no change in the law of remedies whatsoever. The law of remedies in federal question cases, just as in diversity cases, continued to be governed by the Process Acts, as amended by the Conformity Act of 1872. The conclusion is inescapable that Congress in 1875, fully aware that this law of remedies permitted suits for money damages against municipal corporations in diversity cases, intended the same rule to apply in federal question cases.
 
 
 47
 The rejection by Congress of the "Iowa" bills of 1870, quite contemporaneously with the rejection of the Sherman amendment, would seem to be entitled to the same weight insofar as either rejection can legitimately support an affirmative inference of Congressional intention regarding municipal liability. In our view neither rejection is entitled to any weight at all as an expression of any general rule against the imposition of liability upon municipal corporations by federal common law. If the Court ever holds that there is such immunity, it will not be because Congress in 1871 adopted a general principle of solicitude toward such corporations, but because the Court in the here and now wills it.[33]
 
 
 48
 One other argument that is sometimes advanced against implying remedies directly from the Fourteenth Amendment is that by the enactment of a statutory remedy Congress deliberated on the problem of implementing the Fourteenth Amendment and expressly determined to occupy the field and to limit the scope of federal relief. This is, of course, a suggestion that by the enactment of § 1983 Congress intended to eliminate the existing federal law of remedies. If that was the case, then Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), perhaps the most frequently cited case in federal jurisprudence, was wrongly decided, for it did not rely on § 1983, which was not then thought to be applicable to property claims. Ex parte Young approved the issuance of injunctive relief, claimed directly under the Fourteenth Amendment, to prevent the unlawful taking of a utility's property by state enforcement of confiscatory rates. Its authority has never been doubted. A preemption approach would be an innovation turning our back on seventy years of established case law.
 
 VI
 
 49
 I join in the affirmance of the order denying the appellants' motion for a new trial, not only because, as Judge Rosenn's opinion demonstrates, federal jurisdiction was based on a nonfrivolous claim against the municipality, but also for the reason that the claim asserted was demonstrably meritorious. I agree that the district court properly decided the pendent state law claim, however, in preference to deciding even a meritorious Fourteenth Amendment claim. That has been the preferred course since, responding to the political furor over Ex parte Young, supra, the Court decided Siler v. Louisville & Nashville R. R., 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909).
 
 
 
 [1]
 The final judgment awarded appellee was $116,570
 
 
 [2]
 Aldinger v. Howard, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), does not require a different result. Aldinger holds only that a city may not be joined as a pendent party to an action when there is no independent source of federal jurisdiction over the claims against the city. In the instant case, however, we are concerned with the decision of pendent claims where substantial federal claims against the city provide an independent ground of federal jurisdiction. Aldinger does not speak to this situation at all. See generally, Comment, Aldinger v. Howard and Pendent Jurisdiction, 77 Colum.L.Rev. 127 (1977)
 
 
 [3]
 We cannot accept the proposition, urged by our brother Gibbons, that we have expressly held a fourteenth amendment cause of action can be asserted against municipal corporations which are not persons within the meaning of 42 U.S.C. § 1983 (1970). Judge Gibbons relies on Rotolo v. Borough of Charleroi, 532 F.2d 920, 922 (3d Cir. 1976) (per curiam); McCullough v. Redev. Auth. of Wilkes-Barre, 522 F.2d 858, 864 (3d Cir. 1975); and Skehan v. Bd. of Trustees of Bloomsburg State College, 501 F.2d 31, 44 (3d Cir. 1974), vacated and remanded on other grounds, 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975), on remand, 538 F.2d 53 (3d Cir. 1976). In none of these cases, however, was the issue whether a cause of action may be implied presented to the court. On the contrary, each of the three cases directed the challenge only to the district court's "jurisdiction." Given the clear holding of Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), that federal question jurisdiction, as opposed to a federally recognized right to relief, is created by the mere allegation of matters in controversy, arising under the Constitution or laws of the United States, it is not surprising that in Skehan, McCullough, and Rotolo, we spent few words on the jurisdictional challenges. The very brevity of our discussion in those cases belies any intention whatsoever on our part to decide the highly complex and controversial policy issues which Judge Gibbons now discerns in our past, pithy pronouncements. In our view, neither Skehan, McCullough, nor Rotolo decided or even purported to decide the question whether a damage remedy may be implied from the fourteenth amendment
 We believe that the concurrence also misreads Alderman v. Philadelphia Housing Authority, 496 F.2d 164 (3d Cir.), cert. denied, 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (1974). Alderman was an equity suit by several discharged employees of the Housing Authority against the Authority as well as against Stein, its chairman, alleging that their discharge violated the first and fourteenth amendment. Since Stein was clearly a "person" within the meaning of 42 U.S.C. § 1983, we have no occasion to consider whether the Authority was also a proper section 1983 defendant. In fact, we expressly stated that the cause of action was brought under section 1983 and that jurisdiction was founded on 28 U.S.C. § 1343. Id. at 167 n.13. Thus, it was section 1983, not the fourteenth amendment itself, which provided plaintiffs in Alderman with their cause of action for deprivation of their first and fourteenth amendment rights. Notwithstanding Judge Gibbons' bold assertion that Alderman was brought directly under the fourteenth amendment (presumably with jurisdiction based on 28 U.S.C. § 1331), the case is simply irrelevant to the position which he strives to reach in this case.
 Since we can find no decision of the fourteenth amendment cause of action question in Rotolo, McCullough, Skehan, or Alderman, we conclude that even if that question were now properly before us and we think it is not it would be a question of first impression in this circuit.
 
 
 [1]
 See, e. g., Monroe v. Pape, 365 U.S. 167, 191 n.50, 81 S.Ct. 473, 486, 5 L.Ed.2d 492 (1961) ("a municipal corporation is not a 'person' within the meaning of § 1983"); City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973)
 
 
 [2]
 Other Circuits have also recognized suits for damages against municipalities under the Fourteenth Amendment. E. g., Hostrop v. Board of Junior College, 523 F.2d 569, 576-77 (7th Cir. 1975); Roane v. Callisburg Independent School District, 511 F.2d 633, 635 n.1 (5th Cir. 1975). Brault v. Town of Milton, 527 F.2d 730, 732-35 (2d Cir.), vacated on other grounds, 527 F.2d 736 (1975) (en banc); Collum v. Yurkovich, 409 F.Supp. 557, 558 (N.D.Ill.1975); Williams v. Brown, 398 F.Supp. 155, 156-57 (N.D.Ill.1975); Dahl v. City of Palo Alto, 372 F.Supp. 647, 649-51 (N.D.Cal.1974); cf. City of Kenosha v. Bruno, 412 U.S. 507, 511-16, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); Matherson v. Long Island State Park Commission, 442 F.2d 566 (2d Cir. 1971). But see Jamison v. McCurrie, 388 F.Supp. 990, 991-93 (N.D.Ill.1975); Perry v. Linke, 394 F.Supp. 323, 324-26 (N.D.Ohio 1974); Perzanowski v. Salvio, 369 F.Supp. 223, 228-31 (D.Conn.1974); Sanabria v. Village of Monticello, 424 F.Supp. 402 (1976). See generally Note, Damage Remedies Against Municipalities for Constitutional Violations, 89 Harv.L.Rev. 922 (1976); Hunt, Suing Municipalities Directly Under the Fourteenth Amendment, 70 Nw.U.L.Rev. 770 (1975); Note, Implying A Damage Remedy Against Municipalities Directly Under the Fourteenth Amendment: Congressional Action As An Obstacle to Extension Of the Bivens Doctrine, 36 Md.L.Rev. 123 (1976)
 
 
 [3]
 The substance of the claims which can be alleged against individuals under the courts' § 1343(3) jurisdiction and against individuals or corporate entities under its § 1331 jurisdiction are, of course, the same. Lynch v. Household Finance Corp., 405 U.S. 538, 542-52, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972)
 
 
 [4]
 See note 1 supra
 
 
 [5]
 E. g., City of Inglewood v. City of Los Angeles, 451 F.2d 948, 952 (9th Cir. 1972); Miller v. County of Los Angeles, 341 F.2d 964, 966-67 (9th Cir. 1965); Lowe v. Manhattan Beach School District, 222 F.2d 258, 259-60 (9th Cir. 1955); Foster v. Herly, 330 F.2d 87 (6th Cir. 1964); Foster v. City of Detroit, 405 F.2d 138, 144 (6th Cir. 1968); Traylor v. City of Amarillo, Texas, 492 F.2d 1156, 1157 & n.2 (5th Cir. 1974); Haczela v. City of Bridgeport, 299 F.Supp. 709, 712 (D.Conn.1969); Amen v. City of Dearborn, 363 F.Supp. 1267 (E.D.Mich.1973); Madison Realty Co. v. City of Detroit, 315 F.Supp. 367 (E.D.Mich.1970); Dahl v. City of Palo Alto, 372 F.Supp. 647 (N.D.Cal.1974)
 
 
 [6]
 It has been suggested that the "taking" cases may be distinguished on the ground that the Fifth Amendment's prohibition of taking property without "just compensation" explicitly provides for a monetary remedy. Such a distinction, however, is without historical foundation. It is premised on the incorrect view that the holdings of the cited cases were reached by applying the strictures of the Fifth Amendment to the conduct of municipal corporations through the Fourteenth Amendment the so-called incorporation doctrine. However, the prohibition against taking without just compensation which these cases recognized is derived directly from the Fourteenth Amendment's due process clause, without consideration of the applicability of the Fifth Amendment. In the seminal case of Chicago B. & O. R.R. v. City of Chicago, supra, decided in 1897, the Court states:
 It is proper now to inquire whether the due process of law enjoined by the Fourteenth Amendment requires compensation to be made or adequately secured to the owner of private property taken for public use under the authority of a State.
 In our opinion, a judgment of a state court, even if it be authorized by statute, whereby private property is taken for the State or under its direction for public use, without compensation made or secured to the owner, is, upon principle and authority, wanting in the due process of law required by the Fourteenth Amendment of the Constitution of the United States, and the affirmance of such judgment by the highest court of the State is a denial by that State of a right secured to the owner by that instrument. 166 U.S. 235, 241 (, 17 S.Ct. 581, 586).
 The dispute over the incorporation theory as a limitation on the Fourteenth Amendment did not surface until fifty years later. See Palko v. Connecticut, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937). Compare Adamson v. California, 332 U.S. 46, 68, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947) (Black, J., dissenting). For a discussion of the incorporation doctrine as it relates to the Fifth and Fourteenth Amendments, see Malloy v. Hogan, 378 U.S. 1, 4, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).
 
 
 [7]
 Act of April 20, 1871, ch. 22, 17 Stat. 13. See generally Damages Remedies Against Municipalities for Constitutional Violations, 89 Harv.L.Rev. 922, 945-51 (1976); Kates & Kouba, Liability of Public Entities Under Section 1983 of the Civil Rights Act, 45 S.Cal.L.Rev. 131 (1972)
 
 
 [8]
 See Monroe v. Pape, supra, 365 U.S. at 188-191, 81 S.Ct. 473
 
 
 [9]
 See S.Rep.No. 1, 42d Cong., 1st Sess. (1871)
 
 
 [10]
 During the Senate debates Senator Sherman stated:
 In my judgment, and I venture this as a prediction, whether this shall receive the sanction of the Senate or not, this law, if passed, will have as healthy an effect as it had in England, and as it has had in all history. Let the people of property in the southern States understand that if they will not make the hue and cry and take the necessary steps to put down lawless violence in those States their property will be holden responsible, and the effect will be most wholesome. That is the law in nearly all the States of New England; it is the law in the best regulated communities of this country; it is the law in Europe, in many portions of the continent, I am told, although I am not familiar with the laws there myself; certainly it is the law of England. It connects the property of the county with the necessity of preserving the people against lawless and tumultuous violence. This does not make the county responsible for mere assassination, mere individual acts of outrage and wrong and crime; it is only where the wrong is done by a tumultuous assemblage, in the old English term, where it is riotous, where it is done with open violence, so as to attract the attention of the whole community and spread fear and terror, so that every man round about knows what is going on. Then it is the duty of every man to spring to the rescue with gun, or club, or anything he has, and, to use the old English words, by hue and cry to pursue the rioters.
 If the property-holders will not do it; if, as in the southern States the property-holders will lay there quiet on their farms and see these outrages go on day by day; if property-holders will shut their doors when they hear the Ku Klux riding by to burn and slaughter; if they will not rise in their might, and, with the influence which property always gives in any community, put down these lawless fellows, I say let them be responsible.
 In my judgment, this section will do more to put down this class of outrage in the South, and to secure to every man that which the Constitution gives him, than all the criminal statutes you can put on the statute-book, all the threats of indictment you can make against him, all the threats of suits. Why, sir, what do these men who go around, most of them young men without property, care for a suit in the courts of the United States for damages in the name of some negro man who has been whipped? Nothing at all. What do they care for an indictment when they have four chances, even if clearly proved, to be acquitted? But when you have a suit against a county, you have no grand jury by whom it is necessary to find an indictment; you have no sympathy in favor of the county even in the county where these outrages are committed; you will have a sympathy in favor of the plaintiff who has been wronged, and I have no doubt you will be able to enforce a remedy.
 Cong. Globe, 42d Cong., 1st Sess., p. 761 (1871).
 
 
 [11]
 See, e. g., id. at 788 (remarks of Rep. Kerr); id. at 791 (remarks of Rep. Willard); id. at 793 (remarks of Rep. Poland)
 
 
 [12]
 See, e. g., id. at 789 (remarks of Rep. Kerr); id. at 799 (remarks of Rep. Farnsworth); id. at 771-72 (remarks of Sen. Thurman); id. at 763-64 (remarks of Sen. Casserty)
 
 
 [13]
 See, e. g., id. at 788 (remarks of Rep. Kerr); id. at 795 (remarks by Rep. Burchard)
 
 
 [14]
 In Moore v. County of Alameda, 411 U.S. 693, 709-10, 93 S.Ct. 1785, 1796, 36 L.Ed.2d 596 (1973), the Court commented further on its interpretation of the legislative history of the Sherman amendment:
 (I)t cannot be doubted that the House arrived at the firm conclusion that Congress lacked the constitutional power to impose liability upon municipalities, and thus, according to Representative Poland, the Senate Conferees were informed by the House Conferees that the "section imposing liability upon towns and counties must go out or we should fail to agree." To save the Act, the proposal for municipal liability was given up. (footnote omitted).
 
 
 [15]
 See VI The Oliver Wendell Holmes Devise, History of the Supreme Court of the United States, C. Fairman, Reconstruction and Reunion 1864-88, Part One, at 918-1116 (1971) (hereinafter cited as Fairman)
 
 
 [16]
 1 Stat. 73
 
 
 [17]
 Fairman at 931-33
 
 
 [18]
 Id. at 918-1009
 
 
 [19]
 Accord Weber v. Lee County, 73 U.S. (6 Wall.) 210, 18 L.Ed. 781 (1868); Walkley v. City of Muscatine, 73 U.S. (6 Wall.) 481, 18 L.Ed. 930 (1868); United States ex rel. Moses v. City Council of Keokuk, 73 U.S. (6 Wall.) 514, 18 L.Ed. 933 (1868); United States ex rel. Thomas v. City Council of Keokuk, 73 U.S. (6 Wall.) 518, 18 L.Ed. 918 (1868)
 
 
 [20]
 See Judiciary Act of 1875, 18 Stat. 470
 
 
 [21]
 Fairman at 984-85
 
 
 [22]
 Cong.Globe, 41st Cong., 2d Sess., p. 4100 (1870)
 
 
 [23]
 Id. at 4662
 
 
 [24]
 See Fairman at 982 n.251
 
 
 [25]
 Id
 
 
 [26]
 1 Stat. 93
 
 
 [27]
 1 Stat. 333
 
 
 [28]
 4 Stat. 278
 
 
 [29]
 H. M. Hart & H. Wechsler, The Federal Courts and the Federal System 664-65, 668-72 (2d ed. P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler 1973)
 
 
 [30]
 17 Stat. 196
 
 
 [31]
 See note 29 supra
 
 
 [32]
 See note 20 supra
 
 
 [33]
 Mt. Healthy City School District Board of Education v. Doyle, supra, shows conclusively that no such exercise of the Supreme Court's will had taken place. Moreover, if § 1983 should be construed as a grant of immunity from liability for money damages even for such things as the unconstitutional taking of property, that construction would present formidable problems of conflict between the statute and the Court's prior interpretations of the due process clause